# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

THERESA WAHL,

     **Plaintiff**

vs.                                                    **Civil Action No. CV-00-J-3662-S**

COMPASS BANK,

     **Defendant**

## <u>MEMORANDUM OPINION</u>

Currently pending before the court is the defendant's motion for summary judgment (doc. 20), evidence in support of said motion (doc. 21) and a memorandum of law.  Plaintiff submitted a response to said motion as well as evidence in opposition thereto (doc. 22), to which defendant filed a reply.

Plaintiff commenced this action by filing a complaint alleging that defendant discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.* ("Title VII").  Upon consideration of the pleadings, memoranda of the parties and evidentiary submissions received, the court concludes that the

30

motion for summary judgment is due to be granted as no genuine issues of material fact remain and the defendant is entitled to judgment in its favor as a matter of law.

### Factual Background

Plaintiff began working as a console operator for defendant on February 2, 1998. Plaintiff depo. at 54, 208.[1]  Plaintiff was interviewed and hired by Jim McCleney, Regional Manager of Corporate Security, and Kevin Kuykendall, Manager of the Security Console.  Plaintiff depo. at 50-55, 208. Kuykendall became plaintiff's immediate supervisor.  Plaintiff depo. at 79. Plaintiff received "hands-on" training after becoming employed with defendant and also received a memorandum dated February 18, 1998 from Kuykendall providing the procedure for responding to alarms. Plaintiff depo. 81-82, 207-209. The memorandum states:

> We must also be more responsive to alarms we receive at remote sites or buildings during non-operational hours.  If we receive an alarm at a location, we must send the police and a bank representative to meet the police, unless there is written documentation (pass down log, work order, or incident report) stating there is a problem with the system. If you do not find written documentation in the "Tom Greene"

---

[1]Immediately prior to her employment with defendant, plaintiff worked for Security Engineers as a security guard, assigned to Compass.  Plaintiff depo. at 48-49.

book a current pass down log, and you are unsure as to why there is an alarm, send the police and call after hours bank representative. I would rather have someone upset with security for sending the police and waking up a bank representative than for there to be a problem and have us not respond to it.  Remember to always cover your butt!!!! If you ever have any question on how to handle or respond to a situation, please call or page me at any time day or night.

Plaintiff Ex. 1.

On January 7, 2000 plaintiff was working the 3 p.m. to 11 p.m. shift. Plaintiff depo. at 86, 105.  This was not her normal shift, but defendant was short on console operators.  *Id.*  Kuykendall was working with the plaintiff on the occasion in question. Plaintiff depo. at 105.[2]  During the period of time Kuykendall and plaintiff were monitoring the console four alarms appeared on plaintiff's monitoring screen, one of which was the vault alarm on the Plaza Branch in Dallas, Texas.  Plaintiff depo. at 111-112.  A vault alarm is a priority alarm.  McCleney depo. at 18.  Plaintiff contacted the branch, and someone answered the call and stated that branch employees were working late.  Plaintiff requested the branch employee to call her back to inform her when they were finished to make sure everything was secure.  Plaintiff depo.

---

[2]He was working that night because a female console operator scheduled to work did not report for work.  Plaintiff depo. at 105.

at 112-115. Plaintiff then asked for and received permission from Kuykendall to go on a smoking break which lasted around 15 minutes. Plaintiff depo. at 117-118. When she came back, she observed that vault door alarm was still on the screen. Plaintiff depo. at 118. Plaintiff erroneously assumed that it was the same vault alarm that had previously been set off and appeared on her screen. Plaintiff depo. at 134. Shortly thereafter plaintiff received motion detector signals in that branch. She thought they were still in there working because the alarms had automatically cut on. When the motion detectors stopped and the vault door was still open, plaintiff proceeded to call the branch back. She received no answer at that time. Plaintiff depo. at 118. In all, plaintiff received three alarms from the Plaza Branch that night. The one she observed before she went on her smoking break, the one that happened while she was on break, that she assumed was the same as the first, and the third one being the motion detectors. Plaintiff depo. at 134.

After calling the branch and receiving no answer, the plaintiff started calling the "keyholders" (the individuals who hold keys to the branch and are designated to meet the police at the branch). Plaintiff depo. at 118. There are

4

two keyholders for the Plaza Branch.  *Id.*  When she called the number for

the first keyholder, a female, either his girlfriend or wife, answered the call

and stated that he was not there and would not be in until late or very late that

evening.  Plaintiff depo. at 119-120.  Plaintiff told her she was from

Compass Bank, his employment, and that she was in security and that it was

very important that he contact her as soon as he got in.  The female asked

plaintiff if there was a problem, to which plaintiff answered: [P]lease, have

him call. Plaintiff depo. at 120.[3]  Plaintiff proceeded to call the second

keyholder and found out that that person no longer worked for the defendant.

Plaintiff depo. at 120.  Thereafter, plaintiff asked Kuykendall whether there

was anything else she needed to do, to which he replied: " ...no. You've done

what you can.  Wait on the keyholder." Plaintiff depo. at 121, 123.[4]

---

[3] The Investigative Report indicates that plaintiff did not tell the female that it was "urgent." McCleney Aff. Ex. B. However, construing the evidence in the light most favorable to the non-moving party, the evidence is that plaintiff told the female it was "very important" that the keyholder contact her as soon as he got in. Plaintiff depo. at 120.

[4]Plaintiff was asked specifically whether or not she asked Kuykendall, "do I need to call the police?" Plaintiff depo. at 121-122. Plaintiff never answered that question, but rather stated that they had an understanding that the Dallas area police would not respond without a keyholder. Plaintiff depo. at 122. However, plaintiff does not recall specifically any conversation with Kuykendall regarding this police practice during the shift in question. Plaintiff depo. at 124.

Kuykendall then left to go and visit his mother.  Plaintiff depo. at 117.

Kuykendall Aff. of May 24, 2001, ¶3.  Plaintiff never called the police in

response to the alarm, but rather left at the end of her shift, reporting to the

next shift that she was waiting on a keyholder to call her back for that branch.

Plaintiff depo. at 124.[5]

Over $60,000 was stolen from the Plaza Branch during plaintiff's shift

on January 7, 2000.  Plaintiff depo. at 125.  When she found out about the

theft, plaintiff told her fellow console operator, Sonya Berry, that she was

scared of losing her job.  Plaintiff depo. at 198.

Jim McCleney[6] was assigned by VanZandt, defendant's Director of

Corporate Security, to investigate the incident in Birmingham.[7]  McCleney

depo. at 13.  Normally the manager was asked to do this, but since

Kuykendall had actually been involved in the incident in question, McCleney

was chosen.  McCleney depo. at 13.  On January 10, McCleney requested

---

[5]The court notes that at the end of plaintiff's shift she would have been waiting on that call for approximately three and one-half hours.  Plaintiff depo. at 86, 105, 118.

[6]Jim McCleney was plaintiff's and Kuykendall's supervisor on January 7, 2000. McCleney reported to George VanZandt.  Martin depo. at 16.

[7]There was also an investigation performed with respect to the Dallas Branch employees by Compass, the Dallas police and FBI.  McCleney Aff. Ex. B.

plaintiff to write a report of what had occurred the previous Friday night (January 7) and send it to him in the interoffice mail.  Plaintiff depo. at 128.  Plaintiff did that.  Defendant's Ex. 2 to Plaintiff depo.[8]  On January 18, McCleney asked plaintiff to write down "procedures," she should have followed, including calling the police.  Plaintiff felt like he was dictating to her what she should write. Plaintiff depo. at 191-198.  Plaintiff did that, but also wrote down the reason she tried to call a keyholder before calling the police, because she wanted to make sure that was in the statement. Plaintiff depo. at 197.[9]  In her second statement plaintiff acknowledged the procedure to be followed when a vault alarm appears on the console screen to be as follows: "I, Terry Wahl, as a console operator have understood that when we receive alarm at a branch, we first call the branch to see if anyone answeres (sic).  If no answer we dispatch police to branch to check it out, on motions.  If a cash device is left open, we've dispatched police but they ask to have a

---

[8]The reference to "dispatching police for keyholder" in that statement referred to the other two or three alarms plaintiff was dealing with that night, not the Plaza Branch.  Plaintiff's depo. at 192.

[9]Plaintiff was asked: "So you did take your own initiative to write some things in this statement that he [McCleney] didn't tell you to write? She answered: "Correct."  Plaintiff depo. at 197.

keyholder meet them at the branch, that they can't see if the device has been left open without getting in.  This is why we call keyholders first for vaults, night deposits ATM doors." Plaintiff's Ex. 4.  Neither one of plaintiff's written statements included a statement that Kuykendall told her not to do anything else until a keyholder called back.  Additionally, plaintiff never verbally told McCleney that she should not do anything else other than to contact the keyholders on the night in question.  Plaintiff depo at 128-130, 191-192; McCleney depo. at 13-14.[10]

McCleney also interviewed Kuykendall.  Kuykendall Aff. of May 7, 2001 at ¶5.  The statement he gave McCleney reflected his complete knowledge of the incident and the conversations he had with plaintiff that night.  *Id.*  In that statement Kuykendall told McCleney: "On 1/7/00 I worked in the console until 8:15 p.m.  We called several branches to remind them to close their vaults.  This is not uncommon at closing time each night. Two branches, Bunker Hill and Woodland II, left their vaults open, and keyholders and police were sent to each bank.  There were two other banks

---

[10]Plaintiff just told McCleney that Kuykendall was distraught, worried about his sick mother and that he left her alone at the console. *Id.*

8

we received motion detector alarms (sic).  I asked Terri about them and she said one was falsing (sic) and the other was the cleaning crew that never called into the console.  I do not remember which locations we received these were (sic) or what time this happened."  Ex. A to Aff. of Kuykendall of May 7, 2001.  As part of his investigation, McCleney reviewed Kuykendall's memo of February 18, 1998, which stated in part to call and dispatch police and a bank representative and with which plaintiff was familiar.  Plaintiff depo. at 81-82, 207-209.  McCleney also talked with the other console operators to determine the proper procedure for dispatching the police to a type alarm as the one involved at the Plaza Branch on January 7, 2000.  All console operators told McCleney that the policy was to dispatch the police and not to wait for a keyholder before dispatching the police, even in the Dallas, Texas area.  Tucker Aff. ¶4; Wheeler Aff. ¶4-5; McCleney depo. at 23-24, 46, 49.  McCleney also looked at the alarm printouts from the night in question as part of his investigation and reviewed a video tape of the console of January 7, 2000.  McCleney depo. at 23-24.  Plaintiff depo. at 130-131.

After his investigation was completed, McCleney made the recommendation to Martin, the Director of Human Resources for defendant, to terminate both Kuykendall and plaintiff. Martin depo. at 17;  McCleney depo. at 41. Martin approved  plaintiff's termination based on the information he received from McCleney.  Martin depo. at 16-18, 27-30, 40-42, 48-49, 65-67, 72.  Kuykendall had resigned his employment with defendant before January 7, 2000.  Martin depo. Ex. 6, Plaintiff Ex. 5. Kuykendall had not accrued and was not paid for any vacation time when he left on January 13, 2000, his last work day.  He was also not paid for accrued sick leave.  The only payment he received upon resignation was the paycheck owed to him for the pay period directly before the effective date of his resignation. Kuykendall Aff. of May 7, 2001, ¶6.  Plaintiff was given a letter on January 18, 2000 stating:  "You were working the Security Operations Center on January 7, 2000 at 19:30 PM when a vault door and motion detector alarms from the Plaza Branch in Dallas, Texas were received in the operations center. You failed to dispatch the Police and to take the appropriate action on the alarms.  Your failure to act properly has facilitated

a substantial loss to Compass Bank.  Based on your performance on this

instance we have lost confidence and faith in you as a Console Operator.  We

are giving you an opportunity to resign from you position; your failure to

resign will result in your immediate termination.  Defendant's Ex. 4 to

Plaintiff depo.  Plaintiff signed the letter and resigned from her employment.

Plaintiff depo. at 137-138 and Defendant's Ex. 4.

If Kuykendall had not already resigned he too would have been

terminated.  Neither plaintiff nor Kuykendall is eligible for re-employment

with defendant. Martin Aff. ¶5-6.  Plaintiff filed her EEOC charge on

February 10, 2000.  In a letter to plaintiff, the EEOC investigator concluded

that there was no cause to find gender discrimination.  Defendant's Ex. 5 to

Plaintiff depo.

At some time in 1998 another console operator with defendant was

disciplined in connection with his job performance.  John Dauser, the console

operator in question, was working as such with another console operator who

was female.  When he learned of an ATM alarm, he asked the other console

operator if she had called the on-line room to determine if a work order had

been placed on the ATM and if a technician had called.  The female console operator called the on-line  room and told Dauser that a work order had been placed on the ATM.  Shortly thereafter, an individual who identified himself as "Joe" called the console and stated that he was working on the ATM machine.  Joe was the name of the technician who worked on ATM machines and the individual who called sounded like Joe's voice, although it turned out that he was not "Joe."  Although money was stolen from the ATM machine, ACS, the company that serviced the ATM machines, fully reimbursed defendant for the entire loss because it was determined that the individual who stole the money was a former ACS employee who had used his keys from ACS and used Joe's name with knowledge that the console operators would have no reason to suspect any wrongdoing.  Dauser was verbally counseled by Kuykendall because Dauser allegedly did not respond quickly enough in dispatching the police.  McCleney was not involved in the verbal counseling of Dauser.  McCleney Aff. ¶8; Kuykendall Aff. of May 7, 2001 ¶4.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of genuine issues of material fact. *Id.* at

323. The burden then shifts to the non-moving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324; Fed.R.Civ.P. 56(e). In meeting this burden the non-moving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 587; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case .... A genuine issue of material fact does not exist unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). A factual dispute regarding a non-material issue will

not preclude the defendant from succeeding on a motion for summary judgment. *Brown v. American Honda Motor Co.*, 939 F.2d 946, 953 (11th Cir. 1991).

On motions for summary judgment, the court shall construe the evidence and factual inferences arising therefrom in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). All "reasonable doubts" about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). However, all "doubts" need not be so resolved. *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987).

### III. Legal Analysis

Plaintiff asserts that her termination for the incident of January 7, 2000 constitutes gender discrimination. In particular, plaintiff claims that she was terminated for violation of company policy while similarly situated, male employees who violated the same and/or similar policies of defendant were not disciplined in any way. Complaint ¶ 7.

To establish a *prima facie* case of discriminatory discharge, plaintiff must prove: (1) that plaintiff is a member of a protected group (female); (2) plaintiff was qualified for the position from which she was terminated; and (3) plaintiff was terminated. Plaintiff can establish the fourth element of her *prima facie* case by either presenting evidence that she was replaced by a person outside the protected class, *i.e.* a male, or that plaintiff was terminated while similarly situated male employees who committed similar offenses were retained. *See Weaver v. CASA Gallardo, Inc.,* 922 F.2d 1515, 1525 (11th Cir. 1991); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir. 1984). Plaintiff claims the latter. Complaint ¶ 7, and in fact plaintiff was not replaced by a male. Martin Aff. ¶ 7.

Plaintiff cannot show that she was treated differently than similarly situated male employees. The plaintiff's burden under Fed. R. Civ. P. 56(e) is to show that her employer treated similarly situated employees outside her class differently. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997); *Givhan v. Elec. Eng'rs, Inc.,* 4 F. Supp.2d 1331, 1341 (M.D. Ala. 1998). In order for two  employees to be "similarly situated" for purposes of

determining whether plaintiff has met her burden, their conduct must have

been "nearly identical," *Nix,* 738 F. 2d  at 1186. *See also, Jones v. Bessemer*

*Carraway Medical Center,* 137 F.3d 1306, 1311 (11th Cir. 1998) ("Evidence

of similarly situated employees must be used to support Plaintiff's prima

facie case. This aspect of  Plaintiff's case is satisfied if: [T]he plaintiff

[shows] that [she] and the employees are similarly situated in all relevant

respects"), *modified on other grounds; Combs v. Plantation Patterns,* 106

F.3d 1519, 1527-28 (11th Cir. 1997); *Givhan,* 4 F. Supp.2d at 1331. The

standard by which the courts should measure claims that similarly situated

employees were treated differently was addressed by the Eleventh Circuit in

*Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999), wherein the court

stated:

> In determining whether employees are similarly situated for
> purposes of establishing a prima facie case, it is necessary to
> consider whether the employees are involved in or accused of the
> same or similar conduct and are disciplined in different ways.
> *Jones v. Bessemer Carraway Med. Ctr.,* 137. F.3d 1306, 1311
> (11th Cir.) *opinion modified by* 151 F.3d 1321 (1998) (quoting
> *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997)).' The
> most important factors in the disciplinary context are the nature
> of the offenses committed and the nature of the punishments

imposed.' *Id.* (internal quotations and citations omitted). We
require that the quantity and the quality of the comparator's
misconduct be nearly identical to prevent courts from second-
guessing employers' reasonable decisions and confusing apples
with oranges.

Plaintiff asserts that Dauser is a similarly situated male employee who

received preferential treatment.  Complaint ¶7-9; Plaintiff's response at 11.

This court disagrees.   Dauser had his co-worker call the ATM to determine if

a work order had been placed. The work order was confirmed. Shortly

thereafter, a technician who identified himself as "Joe," the person authorized

to do the work and thus could be expected to do it, **called back** and stated he

was working on the ATM machine.  The voice of the false "Joe" sounded like

the voice of the real Joe, and Dauser **did call** the police later.  Plaintiff depo.

at 150, 156-157; McCleney Aff. ¶ 8 .[11]   Additionally, defendant recovered its

entire loss from the company servicing the ATM in the Dauser incident,

whereas the defendant suffered a loss of $60,000.00 in the case at bar.  In her

complaint, plaintiff alleges what she considers to make Dauser a "similarly

_____

[11]Plaintiff faults Dauser for not calling the police for "a couple of hours."  Plaintiff depo.
at 150. By the court's calculations, plaintiff returned to her console after her smoke break around
7:32 p.m. and left her shift at 11:00 p.m., some three and one-half hours later, **without ever
calling the police.**  Plaintiff depo. at 118, 124.

situated" employee as follows: "In 1999, John Dozier (sic) a security console operator of Defendant, did not follow company procedures, which led to a financial loss. He was disciplined or terminated, and was later promoted." Complaint ¶9. Plaintiff's own complaint alleges "financial loss" as a part of the "comparator factors," although in her memorandum, she states that the fact that defendant recovered the money in the Dauser incident "has absolutely NOTHING to do with this case." Plaintiff's response at 13.

Plaintiff, on the other hand, upon seeing the alarm, called the Plaza Branch. An employee answered and stated they were working late. Plaintiff asked him if they would give her a call back when they finished to make sure everything was secure. The employee answering the telephone said he would call her back, Plaintiff depo. at 114-16. Unlike the technician in the Dauser incident, he **never called back.** Upon returning from her smoke break, and realizing when the motion detectors stopped that the vault door was still open, plaintiff called back and received no answer. Plaintiff depo. at 118. She then proceeded to call keyholders, got no one, and left her shift three and one half hours later without further action other than reporting to the next shift

that she was expecting a call back from a keyholder. Plaintiff depo. at 118-

124.  According to plaintiff, she was allowed to proceed in this manner by

Kuykendall before he left. Plaintiff depo. at 121-123. It is undisputed that

neither plaintiff nor Kuykendall ever  told  McCleney this bit of information

before he made his personnel decisions. Kuykendall Aff. of May 7 ¶ 5,

Plaintiff Ex 4; Plaintiff depo. at 128-130.  Applying the "requirement that the

quantity and quality of the comparator's misconduct be nearly identical to

prevent courts from second-guessing employers' reasonable decisions and

confusing oranges with apples"  set forth in *Maniccia,* 171 F.3d at 1368, this

court finds that plaintiff has failed to establish this fourth prong of her *prima*

*facie* case. *Weaver v. CASA Gallardo, Inc.,* 922 F.2d 1515, 1525 (11th Cir.

1991); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185

(11th Cir. 1984).[12]

---

[12]The court finds that one exactly similarly situated employee, Kuykendall, was in fact
treated the same way as plaintiff by defendant. It is undisputed that he would have been
terminated had he not already resigned his position, and that he did not receive any benefits
different from plaintiff. Martin Aff. ¶ 5; Kuykendall Aff. of May 7 ¶6. The defendant argues
additional reasons in support of defendant's motion for summary judgment. Although the court
agrees with these conclusions, the court need go no further in its analysis of plaintiff's claim of
gender discrimination.

The court finding no genuine issues of material fact exist, and that defendant is entitled to a judgment as a matter of law, it is **ORDERED** that defendant's motion for summary judgment is **GRANTED.**

Plaintiff's claim against the defendant is **DISMISSED WITH PREJUDICE.**

**DONE** and **ORDERED** this the _30_ day of October, 2001.


_____
INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

21